THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHANGO BUTLER, | ) |
| *Plaintiff,* | ) |
| v. | ) No. 24 C 211 |
| | ) |
| TRANS UNION, LLC, AND | ) Chief Judge Virginia M. Kendall |
| EXPERIAN INFORMATION | ) |
| SOLUTIONS, INC., | ) |
| *Defendants.* | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shango Butler brought this action against Trans Union, LLC ("Trans Union") and Experian Information Solutions, Inc. ("Experian") for one violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. (Dkt. 1 ¶¶ 58–60). Trans Union was dismissed with prejudice based on a settlement agreement, leaving Experian as the only remaining Defendant. (Dkt. 24). Experian filed for summary judgment. (Dkt. 30). For the below reasons, the Court grants Experian's motion [30].

**BACKGROUND**

The following facts are undisputed unless otherwise indicated. Butler is a "consumer" and Experian a "consumer reporting agency" ("CRA") as defined in the FCRA. 15 U.S.C. § 1681a(c), (f); (Dkt. 1 ¶ 6; Dkt. 18 ¶ 7). Butler alleges that Experian violated the FCRA by failing to "maintain and follow reasonable procedures" to ensure consumers' credit information is appropriately reported, particularly after a discharge in bankruptcy proceedings. § 1681e(b); (*see* Dkt. 1 ¶¶ 59–60).

1

I. **Experian's Bankruptcy Procedures**

As a CRA, Experian compiles information from various vetted and contracted sources, and uses that information to create files for hundreds of millions of U.S. consumers. With respect to bankruptcy-related information, this data comes from three main sources: public records vendors, vetted data furnishers, and consumers themselves. (Dkt. 31 at 4–5). Additionally, Experian relies on internal policies and procedures to review consumer files after it receives notice of a bankruptcy discharge. (*Id.* at 5)

First, Experian relies on its public records vendor, LexisNexis, to provide it with general information. (Hamilton Decl., Dkt. 32-1 ¶ 9). Whenever a consumer files for bankruptcy, LexisNexis will transmit to Experian that consumer's name, the type of bankruptcy petition they filed, the filing date, and the court of filing. (*Id.*) LexisNexis also informs Experian whether a consumer's bankruptcy has been discharged or dismissed. (*Id.*) LexisNexis does not provide information to Experian about the discharge status of specific consumer debts and accounts. (*Id.*)

For account-specific information, Experian relies on its data furnishers. (Dkt. 32 ¶ 4 ("Def. SOF")). Data furnishers can be banks, credit card companies, or other organizations that are parties in bankruptcy proceedings—usually because they are creditors. (*See id.* ¶ 9). Experian vets all data furnishers before accepting their information to ensure they are reliable and capable of providing accurate information, and it monitors their reporting for logical inconsistencies and other problems. (*Id.* ¶ 4). Vetted data furnishers report when specific accounts are included in, or excluded from, a consumer's bankruptcy. (Def. SOF ¶ 3). To communicate this information, they rely on Consumer Information Indicator ("CII") codes. (Dkt. 32-1 ¶ 10). For example, a data furnisher reports a CII code "H" to show a debt was discharged in a Chapter 13 proceeding and a CII code "E" to show a debt was discharged in a Chapter 7 proceeding. (*Id.*). Data furnishers may also report a CII code

"Q," to signal that the subject account was not included or discharged in bankruptcy. (*Id.* ¶ 11). Experian aggregates the data it receives from LexisNexis and its data furnishers to update consumers' credit files.

Experian can also update how an account is reported based on direct communications with the consumer. (Dkt. 36-2 at 55:4-56:1). For example, if a consumer has a debt discharged in bankruptcy, but Experian continues to report the account as having an outstanding balance, the consumer can file a dispute directly with Experian, which will be routed to an investigator. (*Id.* at 31:3–6; 55:4–56:1). Upon receiving the dispute, Experian confirms three things: (1) that the consumer's bankruptcy record is on file; (2) that the account type is generally dischargeable in bankruptcy; and (3) that the account's opening date predates the bankruptcy filing. (*Id.* at 55:15–20; Dkt. 32-1 ¶ 13). If these conditions are met, Experian will update its reporting to show the account as having been included or discharged in bankruptcy. (Dkt. 36-2 at 55:20–22; Dkt. 32-1 ¶ 13). This process is consistent with the concept that Chapter 7 presumptively discharges all a consumer's debt, even if there is no such legal presumption codified in the bankruptcy code. (Dkt. 36 ¶ 31 ("Pl. SOF"); Dkt. 36-2 at 20:14–19).

Finally, Experian applies a set of procedures known as a "bankruptcy scrub" to ensure consumers' post-bankruptcy credit files are accurate. Experian's bankruptcy scrub is born of a nationwide injunction entered in *White v. Experian Info. Sols., Inc.*, 2008 WL 11518799 (C.D. Cal. Aug. 19, 2008) concerning how Experian must "implement reasonable assumptions about which debts are, or are not discharged" in consumer bankruptcy proceedings. (Dkt. 31 at 5). Within eight days of receiving notice that a discharge has been entered in a consumer's Chapter 7 bankruptcy, Experian "scrubs" the consumer's file and updates accounts that are reporting as thirty (30) or

3

more days past due so that these accounts report as discharged in the consumer's bankruptcy. (Def. SOF ¶ 5).

## II. Factual Background

In July 2018, one of Experian's data furnishers reported that Butler had opened a charge card account with WebBank/Fingerhut ("Fingerhut") and began reporting that account on Butler's credit file. (Def. SOF ¶ 7). In October 2018, Butler filed for Chapter 13 bankruptcy and, in doing so, listed the Fingerhut account, which then had a $108 balance. (*Id.* ¶ 8). LexisNexis notified Experian of Butler's bankruptcy the day after he filed. (*Id.*) Butler's Chapter 13 bankruptcy was dismissed on May 26, 2021. (*Id.*) In July 2021, Experian got in touch with the data furnisher responsible for Butler's Fingerhut account to verify the information that it was reporting on that account. (*Id.* ¶ 10). In response, the data furnisher reported a CII code Q and an outstanding balance of $108. (*Id.* ¶ 11). In other words, the data furnisher reported to Experian that Butler's Fingerhut account had *not* been discharged in his Chapter 13 bankruptcy and the amount on the account remained outstanding.

Approximately two years later, in May 2023, Butler filed for Chapter 7 bankruptcy. (*Id.* ¶ 12). He again listed the Fingerhut and its $108 balance in his petition. (*Id.*) Butler's Chapter 7 case was discharged on August 30, 2023, and LexisNexis reported that discharge to Experian the next day. (*Id.* ¶ 13). While the Fingerhut account was excluded from Butler's 2021 Chapter 13 proceeding, the account was discharged as part of his 2023 Chapter 7 filing. But the data furnisher responsible for the Fingerhut account did not update the code Q. By this time, Experian had implemented its bankruptcy scrub procedures, and it ran an initial scrub on Butler's file within eight days of the Chapter 7 discharge. (*Id.* ¶ 14). When that scrub ran, Experian saw the code Q on the Fingerhut account and thus did not report it as having been discharged as part of Butler's 2023

4

Chapter 7. (*Id.*; Dkt. 33 at 1). Experian attributes this inaccurate report to the fact that it did not receive any "objectively verifiable information" either from Butler or the data furnisher that would have caused them to reinvestigate the Fingerhut account's status. (Def. SOF ¶ 14).

In October 2023, Butler applied for a Capital One credit card. (Pl. SOF ¶ 41). Experian's records reflect that Capital One made an inquiry into Butler's credit on October 17, 2023. (*Id.* ¶ 43). Butler claims that Capital One denied his credit application and sent him a letter—which he discarded before this litigation commenced—offering the outstanding Fingerhut balance as a basis for the denial. (*Id.* ¶ 42).[1] This alerted Butler to the inaccuracy on his Experian credit file and caused him to file this lawsuit on January 9, 2024. (Dkt. 1). As a result, Experian investigated the status of Butler's Fingerhut account, confirmed the inaccuracy, and updated the account on February 15, 2024 to show it as discharged in Chapter 7 and with a zero balance. (Def. SOF ¶ 16).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the

---

[1] Because the Court does not reach the issue of damages, evidence concerning whether Butler applied for and was denied a Capital One credit card—and for what reason—is unnecessary to the resolution of Experian's Motion for Summary Judgment. Accordingly Experian's hearsay objections to this evidence, (Dkt. 42 ¶¶ 41–42), are denied as moot.

evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

## DISCUSSION

The FCRA was designed "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Chaitoff v. Experian Info. Sols.*, 79 F.4th 800, 809 (7th Cir. 2023) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)). It demands CRAs like Experian "exercise their grave responsibilities with fairness, impartiality, and a respect." *Id.* The FCRA is comprised of two primary private-action provisions: the reasonable procedures requirement, 15 U.S.C. § 1681e(b), and the reasonable reinvestigation requirement, 15 U.S.C. § 1681i(a). Only § 1681e(b) is at issue in this case. (*See generally* Dkt. 1). That provision requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." § 1681e(b). "Accuracy is not defined in the statute, but it has long been understood that 'accuracy' encompasses both truth and completeness—a report that is misleading or materially incomplete is inaccurate." *Chaitoff*, 79 F.4th at 809. If a CRA negligently violates any duty imposed by the FCRA, the plaintiff may collect actual damages, costs, and fees. *Ruffin-Thompkins v. Experian Info. Sols.*, 422 F.3d 603, 607 (7th Cir. 2005). If the CRA commits a "willful violation" of the FCRA, the consumer may also recover punitive damages. *Id.*

Experian contends that its procedures in collecting, scrubbing, and reporting bankruptcy-related data are reasonable as a matter of law, entitling it to summary judgment. (*See* Dkt. 31 at 9–11) Butler sees things differently. He points to the undisputed fact that Experian is generally aware that Chapter 7 presumptively discharges all a consumer's debts incurred before the petition was filed as evidence that Experian's existing procedures fail to reasonably prevent inaccurate

6

reporting after discharge. (Pl. SOF ¶ 3). Butler suggests Experian has "zero" procedures to prevent outdated code Qs from being reported and that it "completely ignored the glaring fact that [his] obsolete Code Q was still on file from [] prior bankruptcies." (Dkt. 33 at 4–5, 7). In the end, this case presents a narrow question of reasonableness: After receiving notice of a Chapter 7 discharge, can a CRA rely on an exclusionary bankruptcy code reported by one of its vetted data furnishers as to a consumer who has been involved in multiple bankruptcy proceedings?

The FCRA is not a strict liability statute; CRAs must only institute reasonable procedures to "assure maximum possible accuracy." 15 U.S.C. § 1681e(b). In other words, the statute strikes a balance, which has a lot to do with the sheer quantity of data Experian collects and reports. For example, in *Sarver v. Experian Info. Sols.*, the court recognized that Experian gathered data from 40,000 sources involving 200 million names and addresses and 2.6 billion trade lines, resulting in more than "50 million updates to trade information each day." 390 F.3d 969, 972 (7th Cir. 2004). Accordingly, courts have declined to impose requirements on CRAs that would force them to examine "each computer-generated report . . . for anomalous information" and launch an investigation if any is found. *Id.* Instead, the cases focus on whether a CRA has "notice of prevalent unreliable information from a reporting lender." *Id.* No § 1681e(b) liability will follow an instance when "an item of information, received from a source that [the CRA] reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures." *Id.* The Seventh Circuit has recognized several sources of sufficient trustworthiness that CRAs can rely on as a matter of law. *See, e.g.*, *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994) (allowing reliance on "a court's Judgment Docket" absent notice the information may be inaccurate); *Chaitoff*, 79 F.4th at 816–17 (recognizing it is reasonable for CRAs to rely on reports from "major financial institutions").

Here, Experian reasonably relied on information provided by one of its vetted data furnishers about the status of Butler's Fingerhut account. Without notice of an inaccuracy in the CII code Q attached to that account, "Experian had no reason to suspect that [the] reporting was incomplete." *Chaitoff*, 79 F.4th at 816. CRAs must rely on the research and information financial institutions provide. To hold otherwise would result in ballooning costs that would be passed along to the consumer. *Id.* That leash is not without a limit, though. For example, when a CRA "has been notified of potentially inaccurate information in a consumer's credit report, it is in a very different position than one who has no such notice." *Henson*, 29 F.3d at 286–87 (cleaned up). That is why many FCRA cases also include claims under § 1681i(a), claiming the CRA unreasonably investigated a reported error or inaccuracy. *See, e.g.*, *Young*, 776 F. Supp. 3d at 740–42 (granting summary judgment in Experian's favor on a plaintiff's reasonable procedures claim but denying summary judgment on the same plaintiff's reasonable reinvestigation claim). But that is not the case here. As soon as Experian had notice of the alleged inaccuracy in Butler's credit file—which came by virtue of Butler filing his complaint—it promptly reinvestigated and updated the Fingerhut account status. (Def. SOF ¶ 16; Pl. SOF ¶ 40).

That Butler had been involved in prior bankruptcy proceedings does not alter the reasonableness of Experian's conduct. As Experian notes, there are many reasons why a data furnisher might continue to report a code Q in instances involving subsequent bankruptcy proceedings. (Dkt. 41 at 5–6). For example, the data furnisher might think the debt was improperly scheduled, or that the account is of a kind generally excepted from discharge under federal law. (*Id.*) Thus, the lone fact that Experian received notice of Butler's Chapter 7 discharge does not amount to notice of an error with the CII code attached to his Fingerhut account. (*See* Dkt. 36 ¶ 18). If Butler could hold Experian liable for its reliance on its data furnishers' continued reporting of a

8

code Q, this Court would effectively be creating a rule that would force CRAs to second guess every post-bankruptcy exclusionary code. This is exactly the kind of wading through the docket that other courts have found would result in undue burdens on CRAs considering the sheer amount of data they process. *See Rydholm v. Equifax Info. Sols.*, 44 F.4th 1105, 1109 (8th Cir. 2022) (citing the Seventh Circuit's decision in *Henson*, 29 F.3d at 287 and recognizing that it is not reasonable to require a CRA to "wade into individual bankruptcy dockets to discern whether a debt survived discharge").

The district court opinions on which Butler relies do not compel a different conclusion. *Laura*, the only in-circuit district court case Butler cites is inapposite. *See Laura v. Experian Info. Sols.*, 2022 WL 823853, at *2–*3 (N.D. Ill. Mar. 18, 2022). There, the CRA reported a balance as outstanding for an account that it concluded was discharged in bankruptcy based on a report from a collections agency. *Id.* at *1, 3. The court denied summary judgment and found that a Chapter 7 discharge notice was sufficient to alert Experian that one of the plaintiff's outstanding accounts was discharged, calling into question the reasonableness of Experian's procedures. *Id.* at *3. But, in *Laura*, Experian was not relying on "inaccurate information received from reliable sources without notice of inaccuracy." *Id.* And Experian conceded that it should have assumed the bankruptcy discharged the at-issue debt pursuant to the *White* order and its bankruptcy scrub procedures. *Id.* Here, by contrast, Experian was relying on inaccurate information—the Fingerhut code Q—from one of its vetted data furnishers. And unlike the general account information from the collections agency in *Laura* that the bankruptcy scrub is designed to correct, the more particular code Q in this case is bankruptcy-specific, and signals to a CRA that the debt should *not* be reported as discharged. Thus, the Fingerhut account was not the kind Experian should have assumed was discharged pursuant to the *White* order. Indeed, the *White* injunction, which led Experian to

9

develop its bankruptcy scrub procedures in the first place, specifically references code Qs. *White*, 2008 WL 11518799, at *12. It indicates that when a data furnisher reports a code Q on a particular account, Experian may report that account in a "non-bankruptcy status, provided that [it] has not previously received truthful, objectively verifiable information directly from the Consumer in connection with a non-frivolous/non-irrelevant request for reinvestigation indicating the debt was in fact discharged." *Id.* Of course, Butler did not alert Experian to the need for a reinvestigation in this case, depriving Experian of any information that the code was inaccurate.

Finally, Butler's citations to a line of district court decisions out of the Eighth Circuit do not help his cause. *See Gibson v. Experian Info. Sols.*, 494 F. Supp. 3d 613 (E.D. Mo. 2020); *Morris v. Experian Info. Sols.*, 478 F. Supp. 3d 765, 768–69 (D. Minn. 2020); *Alsibai v. Experian Info. Sols.*, 488 F. Supp. 3d 840 (D. Minn. 2020); *Ferrin v. Experian Info. Sols.*, 617 F. Supp. 3d 998 (D. Minn. 2022). Each of these cases predates the Eighth Circuit's decision in *Rydholm*, which is on all fours with this Court's decision today. 44 F.4th at 1108–09. The court in *Rydholm* found that a plaintiff similarly situated to Butler failed to clear the even lower motion to dismiss standard when alleging that a CRA failed to follow reasonable procedures by reporting an account as open and outstanding after receiving notice of the plaintiff's Chapter 7 discharge. *Id.* at 1107, 1109. Adopting the robust body of Seventh Circuit FCRA case law on reasonable procedures, the *Rydholm* court concluded that the CRA was entitled to rely on information a financial institution provided, even if incorrect, "[a]bsent notice that the discharge specifically included" the at-issue account. *Id.* at 1109.

Experian was entitled to rely on the code Q its data furnisher continued to report on Butler's Fingerhut account considering it had no information—from Butler or anyone else—that would alert it to the possibility that "the source may be unreliable." *Henson*, 29 F.3d at 287. Accordingly,

10

no reasonable juror could conclude that Experian's failed to implement reasonable procedures in this case. The Court thus grants summary judgment in Experian's favor on Butler's § 1681e(b) claim.

## **CONCLUSION**

For the above reasons, Experian's Motion for Summary Judgment [30] is granted.

                                               Virginia M. Kendall
                                               United States District Judge

Date: September 29, 2025